**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian (SBN: 24903)
ak@kazlg.com
245 Fischer Ave., Suite D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**NEWSOME MELTON, PA**
C. Richard Newsome (to seek PHV)
newsome@newsomelaw.com
William C. Ourand, Jr. (to seek PHV)
ourand@newsomelaw.com
201 S. Orange Ave, Suite 1500
Orlando, Florida 32801
Telephone: (407) 648-5977

**LEVIN PAPANTONIO RAFFERTY**
William F. Cash, III (to seek PHV)
bcash@levin.com
316 S. Baylen Street
Pensacola, Florida 32502
Telephone: (850) 435-7059

*Attorneys for Plaintiffs,*
*Tinisha Miller and Robin McCoy*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

TINISHA MILLER and ROBIN MCCOY, Individually And On Behalf Of Those Similarly Situated,

Plaintiffs,

v.

NISSAN NORTH AMERICA, INC.,

Defendant.

Case No. 3:21-cv-01029

**CONSUMER CLASS ACTION COMPLAINT FOR VIOLATIONS OF:**

1) **CONSUMER LEGAL REMEDIES ACT;**
2) **UNFAIR COMPETITION LAW;**
3) **SONG-BEVERLY ACT;**
4) **EXPRESS WARRANTY; AND**
5) **MAGNUSSON-MOSS WARRANTY ACT.**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1. This action concerns a critical safety defect affecting more than a million Nissan Altima vehicles. Specifically, Altima model vehicles for years 2013-2018 have a documented defect in the hood latch systems which can (and repeatedly has) resulted in the vehicles' hoods flying open at high speeds on the road—completely blocking the drivers' fields of vision. The defect poses an obvious safety hazard and has already caused several crashes. Nissan North America, Inc. ("Defendant" or "Nissan") has issued four separate recalls for the defect dating back to 2014. The defect persists, however, and Nissan has nonetheless chosen to continue selling and leasing vehicles with the same dangerous, defective hood latch systems.

2. Plaintiffs and similarly situated consumers paid significant sums of money to own and lease the class vehicles. Nissan gladly accepted their money but has failed to own up to its obligation to provide safe and functional vehicles.

3. Accordingly, Plaintiffs now bring this case individually and on behalf of all other similarly situated consumers to require Nissan to conform its conduct to the law, honor its warranties, repair the defective vehicles, and reimburse and compensate all affected owners and lessees. Plaintiffs seek all available monetary damages, as well as all available equitable and injunctive relief.

## THE PARTIES, JURISDICTION, AND VENUE

4. Plaintiff Tinisha Miller, a proposed class and subclass representative, is an adult citizen of the State of California. Her place of domicile is in Contra Costa County, California, a state different from that of Defendant's.

5. Plaintiff Robin McCoy, a proposed class and subclass representative, is an adult citizen of the State of California. Her place of domicile is in Riverside County, California, a different state from that of Defendant's.

6. Defendant Nissan is incorporated under the laws of Delaware and maintains its principal place of business in Tennessee.

///

7. The United States District Court for the Northern District of California has subject matter jurisdiction over this action under the Class Action Fairness Act because there is minimal diversity and the matter in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs. 28 U.S.C. § 1332(d)(2)(A). None of the causes of action stated here has been assigned or otherwise given to any other court or tribunal.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). Nissan does substantial business in the State of California and within this judicial District, is registered to and is doing business within the State of California, and otherwise maintains requisite minimum contacts with the State of California.

9. Nissan distributes the defective vehicles in this judicial District and receives substantial compensation and profits from the sale and lease of the defective vehicles in this judicial District, and it has and continues to conceal and make material omissions in this judicial District so as to subject it to personal jurisdiction in this judicial District.

10. Venue is also proper in this District because, like many other class members, significant and material aspects of the transactions relating to Plaintiff Miller's purchase of her defective vehicle occurred within and were otherwise connected to this judicial District.

**GENERAL ALLEGATIONS**

11. The defect in this case involves the hood latch systems in Nissan Altima vehicles years 2013-2018.

12. The hood latch system locks and releases the vehicle's hood.

///

///

///

///

///

13. The hood has two different latches: the primary latch, located inside the vehicle, and the secondary latch, located underneath the hood.



***Primary latch*** ***Secondary latch***

14. The primary latch allows owners to pop open the hood while inside the vehicle.

15. Once the primary latch is released, the hood raises slightly, permitting access to the secondary latch.

16. The secondary latch is intended to keep the hood in the locked position until it is pushed in after the primary latch has been released. This provides a critical failsafe against the hood unexpectedly raising at an inopportune time—e.g., while being driven.

17. As early as 2013, Nissan Altima owners began reporting incidents in which their hoods flew back as they were driving their vehicles ("hood latch incidents") to Nissan and the National Highway Traffic Safety Administration ("NHTSA"). Examples of those early reports include:

> Got back on the road, small town, no traffic and **my hood flew open and back against the windshield**. I may have inadvertently hit the hood latch the 1st time-not sure but regardless, the secondary catch should have prevented this at 25-30 MPH. **What if I had been on expressway?** No damage to me but $2100 damage to car.

*Nov. 3, 2013 Incident, Submitted Nov. 4, 2013, ODI #10550877* (emphasis added).

> **I was driving with my wife and daughter and just stopped at a light. I made a left hand turn and when the car reached about 25 to 30 MPH I heard a loud boom and could not see out my windshield**. I realized that may **hood just opened and slammed into my windshield**. Thank God I was not on a major highway at the time going twice the speed."

*Feb. 28, 2014 Incident, Submitted March 3, 2014, ODI #10566870* (emphasis added).

> When I got in the Altima the hood was securely latched. When I hit 25 MPH **the hood flew up, blocking my windshield and preventing me from seeing**.

*April 14, 2014 Incident, Submitted April 18, 2014, ODI #10583434* (emphasis added).

> **While I was driving the vehicle on a residential neighborhood at a rate of approximately 30 MPH, with my six month-old baby in the back seat, the hood flew open and smashed into my windshield. I narrowly avoided losing control of the vehicle despite having my view completely obstructed** by the presence of the hood on the windshield.
>
> *****
>
> As a result of the hood colliding with the windshield, **the vehicle has sustained significant damage.**

*April 30, 2014 Incident, Submitted May 23, 2014, ODI #10593809* (emphasis added).

18. Nissan began investigating the hood latch defect as early as May 2014. It has since attributed the defect to a wide-ranging array of problems, pointing the finger at multiple suppliers, service technicians, and the consumers themselves, all while issuing multiple ineffective recalls.

19. Nissan has failed to fix the problem because it continues to point the finger at external causes, rather than re-designing and replacing the defective hood latches to ensure they are sufficiently robust to perform their intended function reliably and safely.

20. And despite its knowledge of the hazard and apparent inability to fix the problem, Nissan has continued selling and leasing vehicles with the defective hood latch systems.

21. As a result, Nissan has continued to subject its customers, including Plaintiffs and the class, to the type of severe risk of harm exemplified in the reports below:

> The contact owns a 2013 Nissan Altima. **While driving 70 MPH, the hood latch released independently**. As a result, the **hood collided into the windshield.** The contact sustained **neck, head, shoulder, and back injuries** that required medical attention.

*Oct. 21, 2016 Incident, Submitted Nov. 16, 2016, ODI #10926676* (emphasis added).

> In late December 2016, our 2013 Nissan Altima was being driven in High Point, North Carolina **when the hood of the car flew open against the windshield causing zero visibility** and the car was **forced off the road causing it to be damaged**.

*Dec. 21, 2016 Incident, Submitted Jan. 1, 2017, ODI #10940184* (emphasis added).

> **Hood flies up randomly due to latch recall**. Resulted in scratches as **I lost control of the vehicle**. Went to two dealerships to have the issue resolved. **Nissan refused to cover damages** stating that there is no way to prove its associated with the incident. **You try driving with hood in your face and see if you can avoid [] killing yourself.**

*Dec. 28, 2016 Incident, Submitted Feb. 5, 2017, ODI #10954827* (emphasis added).

**A. Nissan begins the series of recalls with shifting explanations back in 2014.**

22. Nissan claims it determined that the hood latch issue was a safety defect in September 2014, after receiving “data from Enterprise Rent-a-Car indicating a

larger than previously known number of vehicles that had experienced reported hood-related incidents."[1]

23. That same month, Nissan reported the hood latch safety defect to the NHTSA, and then recalled 220,423 model year 2013 Nissan Altimas.

24. Nissan's 2014 defect report to NHTSA described the problem as being "rare" and attributed the defect to interference between the hood inner panel and secondary lever, combined with debris and corrosion—which could, in turn, cause the secondary hood latch to remain open after the hood closed.

25. Nissan acknowledged to NHTSA the defect posed a "safety risk," because "the hood may open while driving and obscure the driver's vision, increasing the risk of a crash."[2]

26. The 2014 recall procedure merely required dealers to first inspect, clean, and lubricate the secondary hood latch, and then check to see whether the secondary latch could freely move.







27. Then, if the secondary hood latch was unable to freely move, the hood latch assembly was replaced.

///

---

[1] Recall 14V-565, Chronology, https://static.nhtsa.gov/odi/rcl/2016/RCORRD-16V029-9910.pdf.

[2] Recall 14V-565, Part 573 Safety Recall Report, https://static.nhtsa.gov/odi/rcl/2014/RCDNN-14V565-5550.pdf (submitted Sept. 12, 2014).

28. If, however, the secondary hood latch could freely move, the dealer bent the secondary hood latch lever using an angled pry-bar.







29. The 2014 recall procedure was effectively a band-aid and did not address the fundamental design flaws—described more fully below—which rendered the hood latch systems defective. As a result, hood latch incidents continued, both for vehicles that received the recall, and for vehicles not included in the recall. A few examples include:

> The contact owns a 2013 Nissan Altima. **While driving approximately 45 MPH, the hood opened independently and damaged both front quarter panels.** The dealer was unable to diagnose the cause of the failure. The vehicle was repaired. **The contact referenced NHTSA campaign number 145565000(structure); however, the VIN was not included in the recall. The manufacturer was notified of the failure.** The approximate failure mileage was 17,367.

*Dec. 6, 2013 Incident, Submitted Oct. 14, 2014, ODI #10644444* (emphasis added).

> The incident happened around midnight. **The hood popped open while the vehicle was being driven. Fortunately, there were no vehicles in the front or rear. This scared the hell out of us.** We checked the internet to see if any similar incidents were reported. We found that 238,000 Nissan Altima 2013 were being recalled because of this problem. **We brought the matter to the dealer's attention as well as to the attention of the manufacturer. We have been told that**

> **the VIN of our vehicle is not part of the recall. Nissan has refused to repair the vehicle.** The hood is damaged on both sides near the windshield because it slammed into windshield when it popped open. **We are demanding justice and repair of our vehicle and a safety check.**

*Nov. 11, 2014 Incident, Submitted Dec. 2, 2014, ODI #10661833* (emphasis added).

> The contact owns a 2013 Nissan Altima. **The contact stated that the vehicle was taken to a dealer for a manufacturer recall concerning the hood latch. The dealer stated that the vehicle was repaired for the recall. While driving 60 MPH, the hood latch fractured and caused extensive damage.** The vehicle was towed to an independent mechanic who further inspected the hood latch and stated that it was not replaced. The mechanic checked with the manufacturer who stated that the hood latch had been on back order and that the dealer lubricated the latch, but did not replace the part. The independent mechanic stated that the hood latch needed to be replaced to prevent the failure. **The contact was unable to determine when the manufacturer would be able to supply the hood latch part to the dealer.** The vehicle was repaired by the independent mechanic. The manufacturer was notified of the failure. The approximate failure mileage was 44,000.

*Feb. 2, 2015 Incident, Jan. 15, 2016, ODI #10820532* (emphasis added).

### B. Nissan issues a second, larger recall in 2015, but again fails to fix the defect.

30. In the face of the continuing hood latch incidents, Nissan began looking for others to blame for its fundamentally defective hood latches.

31. Nissan reported to NHTSA that it had audited its suppliers in 2015 and determined that a tier-3 level supplier's anti-corrosion painting did not meet the requisite specifications, stating: "As a result, the paint may flake off leaving bare metal exposed, increasing the risk of corrosion in the affected area. Over time, the

corrosion may create mechanical binding that could cause the secondary hood latch to remain in the open position if the hood is not properly closed."[3]

32. Nissan subsequently issued another recall for the defect in February 2015, this time including 2013 through 2015 model year Altimas and increasing the recalled vehicle number to 625,400 (an increase of more than 400,000 vehicles over the 2014 recall).

33. As part of the 2015 recall, Nissan instructed dealers to check the secondary hood latch movement, and if it moved freely, clean and lubricate the latch. If it did not move freely, the dealer was to apply rust penetrant and then clean and lubricate the secondary hood latch.







34. The dealer was to replace the hood latch if still did not freely move.

35. Finally, the dealers were instructed to apply white lithium grease to the hood latch.




[3] Recall 15V-116, Part 573 Safety Recall Report, https://static.nhtsa.gov/odi/rcl/2015/RCLRPT-15V116-1837.PDF (March 18, 2015).

36. The 2015 recall was also an ineffective band-aid, as, again, the recall "fix" did not work (incidents continued in vehicles that received the "fix") and it was still underinclusive (vehicles excluded from the recall continued exhibiting the defect). Examples include:

> I am unable to close the hood of my car completely. The hood latch is loose at all times and I am unable to use the 'open hood' button on the interior. I never received a recall notice from Nissan. However, when I took my car in for its first service appointment at Edison Nissan dealership (4/21/2015), **the service technician reported that the recall was addressed and serviced. Today on 8/10/2015, the hood popped open and I am unable to close it**.

*Aug. 10, 2015 Incident, Submitted Aug. 10, 2015, ODI #1074694* (emphasis added).

> **While driving the vehicle on 12/17/2015 on a ramp to a highway, the secondary latch (recall previously at dealership to be repaired 7/2015) failed causing the hood to fly up**. Filed complaint with Nissan who told us to take it to a dealership. We took it to a dealership in which they verified the secondary latch was not working and gave us an estimate of $3,200 in damages. We are still waiting for Nissan to approve the repair of the latch and damages. **They now are telling us that they have to send an adjuster to look at the car and that could take weeks. In the meantime, we are driving an unsafe vehicle with children.**

*Dec. 17, 2015 Incident, Submitted Jan. 19, 2016, ODI #10820987* (emphasis added).

**C. Nissan issues another ineffective recall in 2016.**

37. In the face of continuing incidents, Nissan again acknowledged that its previous recalls were ineffective, issuing another recall in January 2016. The January 2016 recall encompassed 846,000 vehicles—an increase of more than 200,000 vehicles from the 625,400 included in the 2015 recall.

38. Nissan once more pointed the finger at its business partners, claiming that a supplier failed to properly apply coating to the hood latch assemblies.

39. Nissan also went on to claim it had actually fixed the issue this time, promising that it would "replace the hood latch assembly in order to provide a more robust, long term repair."[4]

40. But the new assembly installed as part of the 2016 recall was again ineffective and underinclusive. Hood latch incidents continued:

> Nissan had a hood release issue which resulted in a recall. **My hood popped up and resulted in scratches to both sides of my car. I reported it to Nissan and they will not cover it. I went to Russ Darrow Nissan Milwaukee to fix, however it was not done correctly. I went to Amato Nissan to have the hood repaired again after the hood popped up again.**

*March 1, 2016 Incident, Submitted Jan. 24, 2017, ODI #10947462* (emphasis added).

> Last week my daughter was driving her 2013 Nissan Altima at approximately 20 [MPH] when the **hood suddenly flew up and crashed into the windshield**. Luckily there was no traffic around and she was able to close the hood back down and return the short distance to her home. When I inspected the vehicle the next day I discovered that the secondary hood latch did not work. Upon investigation I discovered that Nissan had recalls on this model for this specific issue. I contacted the NHTSA and reported the issue. I was told that the recall repair had not been done as per their records. I then **contacted Nissan to inform them of the issue and they said that the recall repairs had actually been completed earlier this year by a Nissan dealer in Florida** (we purchased the vehicle from a car lot in Florida in October of 2016). After a discussion with Nissan customer relations they towed the vehicle to one of their local dealers for inspection (12/30/16). **Their investigation found that the replaced secondary latch had failed therefore allowing the hood to fly open.** I am **deeply concerned about the safety of this vehicle**. If this had been in traffic, at a higher rate of speed or other conditions **serious injuries would have been possible**. **How**

[4] Recall, Part 573 Safety Recall Report, https://static.nhtsa.gov/odi/rcl/2016/RCLRPT-16V029-6900.PDF.

> **do I know that whatever new repairs that are done will solve this serious issue?**

*Dec. 28, 2016 Incident, Submitted Jan. 5, 2015, ODI #10939875* (emphasis added).

> The **hood popped open and flew up while driving, damage to the fender on both sides, roof and hood**. Nissan recalled Altimas three times in the past to repair hood latches that can cause hoods to fly open however **there is no recall campaign associated with the enclosed VIN number**.

*Nov. 7, 2017 Incident, Submitted March 15, 2018, ODI #11079527* (emphasis added).

> On 12/30/2018 I had just left the parking lot of the local Walmart and was at a complete stop for a stoplight on the corner of County Hwy Z and State Road 13, waiting to turn left. On the green**, I turned and drove approximately 500 feet and my hood flew open to the point of slamming into the roof of the car damaging the vehicle.** I pulled over and closed the hood and slowly drove home. When home I checked to see if possible recall on hood. There have been some, **I contacted the local dealership after the holidays and was told my VIN was not part of the recall, therefore they couldn't fix any damages and I was to contact Consumer Affairs.**

*Dec. 30, 2018 Incident, Submitted Jan. 15, 2019, ODI #11170160* (emphasis added).

### D. Nissan finally admits it has no solution in its latest recall and continues blaming others for a dangerous defect unique to its vehicles.

41. Nissan issued another hood latch recall in May 2020. This fourth recall encompassed 2013-2018 Nissan Altimas and expanded the recall number by nearly one million vehicles (from 846,000 to 1,831,818).

42. In its 2020 recall notice, Nissan acknowledged that the "issue is unique" to the recalled vehicles, and it attributed the problem to the "front end design, anti-

corrosion limitations and location of the hood latch release in close proximity to the fuel door release."[5]

43. However, the company went on to blame service technicians and customers for improper inspections and maintenance, stating:

> Over time, build-up caused by driving with the primary hood latch disengaged allows excessive, corrosive contaminants to contact the hood latch assembly. This build-up, **combined with a lack of proper inspection and maintenance of the secondary hood latch**, can create mechanical binding that could cause the secondary hood latch to remain in the open position after it has been disengaged.[6]

44. Nissan also admitted that it had no real answer at this time—stating that "[a] remedy plan is currently under development."[7]

45. Instead, for the present time, Nissan has simply "instructed owners how to properly maintain the latch per the Owner's Manual general maintenance requirements," and provided "a reminder to fully close and engage the primary hood latch each time before driving."[8]

46. Nissan's continuing efforts to blame others fall flat. The hood latch is a basic component. It's not a high-tech or cutting-edge feature. Every car on the road has a hood latch. This has been true for a hundred years. Yet only Nissan cars are exhibiting this problem on a widespread basis in this day and age.

**E. The class vehicles are fundamentally defective.**

47. Something is fundamentally different with the defective Nissan class vehicles as compared with all other vehicles on the roadway.

///

///

---

[5] Nissan's Sept. 16, 2020 Defect Info. Report, https://static.nhtsa.gov/odi/rcl/2020/RMISC-20V315-0010.pdf (emphasis added).

[6] *Id.* (emphasis added).

[7] *Id.*

[8] *Id.*

48. The reality is that the defective class vehicles are exhibiting a widespread failure of a basic component because they are defectively designed and manufactured. The defects include:

a. The hood latch systems are simply not robust enough to safely perform under foreseeable, real-world use, service, inspection, and maintenance conditions;
b. The hood latch systems are not designed and manufactured in accordance with industry standard alternative designs which have been used over the past century, and have afforded reliable, safe, and functional use;
c. The hood latch systems' specifications and tolerances are insufficient to account for real-world use, service, inspection, and maintenance conditions;
d. The hood latch systems' return springs are too weak, preventing the systems from properly latching and remaining closed;
e. The hood latch systems have a weak locking system, preventing the systems from properly locking and remaining locked;
f. The primary hood latches are defectively located immediately next to the fuel latches, resulting in the hood latches being inadvertently released; and/or
g. The secondary hood latches fail to perform their intended failsafe function of remaining closed after the primary hood latches have inadvertently released.

49. Nissan has failed to publicly acknowledge and disclose the true nature and extent of the defect. It has likewise failed to disclose the repairs and replacements needed to properly address the defect and eliminate the safety hazard.

50. Instead, Nissan has asserted, multiple times, that it came up with a fix, only for that fix to fail. These assertions were false, deceptive, and misleading because

Nissan either knew the failed fixes would not work, or Nissan simply had not done the engineering analysis and testing needed to properly assure that the fixes would be effective.

51. Nissan's conduct is particularly egregious given that the hood latch is a low-tech component and there are alternative designs that have been effectively used over the past century which do not fail in a widespread manner, as is happening with the class vehicles.

52. Nissan could have eliminated the problem altogether back in 2013 by simply using one of the many alternative designs employed on vehicles over the past century. It chose not to, instead electing to subject its customers to repetitive, involuntary experimentation on a critical safety issue.

**F. Hood latch incidents continue as consumers are left driving dangerous, defective vehicles while Nissan offers no real solutions.**

53. As established above, Nissan has chosen to continue profiting from the sale and lease of Altima vehicles since 2013, despite knowing that those vehicles are defective and pose a severe danger to consumers. The consumers, in turn, are left driving unreasonably dangerous, defective vehicles.

54. Unlike Nissan, the average everyday consumer does not have billions of dollars in resources. The average consumer has financial constraints which do not allow them to readily purchase or lease new vehicles.

55. The precarious position Nissan has placed its customers in is well-exemplified in the following incident reports from late 2019 through 2020:

> The contact owns a 2015 Nissan Altima. **The contact stated while driving 30 MPH, the Hood unlatched and flew open and caused damage to the fenders.** The contact **received notification of NHTSA campaign number: 20V315000 (latches/locks/linkages).** The vehicle was taken to an independent mechanic where the damage was repaired. **The contact stated that the manufacturer exceeded a reasonable amount of time for the recall repair.** The local

> dealer and manufacturer were not contacted. The vehicle was not diagnosed nor repaired. The failure mileage was 80,000. **VIN tool confirms parts not available.**

*Dec. 23, 2019 Incident, Submitted July 29, 2020, ODI #11342093* (emphasis added).

> The contact owns a 2014 Nissan Altima. **The contact stated that while driving 20 MPH, the hood independently unlatched and opened without warning.** The contact pulled over and closed the hood. The contacted received notification of NHTSA campaign Number: 20V315000 (latches/locks/linkages)[.] However, **the part to do the recall repair was unavailable.** A dealer was not contacted. The vehicle was not diagnosed nor repaired. The manufacturer had not been informed of the failure. **VIN tool confirms parts not available.** The failure mileage was unknown**.**

*Feb. 1, 2020 Incident, Submitted July 29, 2020, ODI #11342053* (emphasis added).

> The contact owns a 2013 Nissan Altima. The contact stated that **while driving approximately 40 MPH on a windy day, the hood erroneously opened crashing into the front windshield and severely damaging the hood and the roof of the vehicle.** During the incident, the driver **sustained a bruised right leg and contact from glass pieces.** The vehicle was driven to the contact's residence and later **towed to the local dealer Collins Nissan** . . . where the cause of the failure was not determined. **The vehicle was not repaired**. The **VIN search indicated that the vehicle was not included NHTSA campaign number 16V0290000** (structure). The contact stated that **the vehicle had experienced the same failure listed in the recall**. The manufacturer was contacted and a case was opened. The failure mileage was 190,000**.**

*April 23, 2020 Incident, Submitted May 5, 2020, ODI #11323359* (emphasis added).

> The contact owns a 2017 Nissan Altima. The contact stated she noticed **the hood latch was constantly unlatched**. The contact stated **the failure recurred three times**. The contact received notification of NHTSA campaign number

> 20V315000 (latches/locks/linkages)[.] However, **the part to do the recall repair was unavailable.**

*April 30, 2020 Incident, Submitted July 21, 2020, ODI #11340751* (emphasis added).

> The contact owns a 2018 Nissan Altima. The contact received notification of NHTSA campaign number: 20V315000 (latches/locks/linkages)[.] However, **the part to do the recall was not yet available.** The contact **called Coggin Nissan at the Avenues in Jacksonville** . . . and it was **confirmed that parts were not available yet.** The contact stated that **the manufacturer exceeded a reasonable amount of time for the recall repair**. The **manufacturer was made aware of the issue**. The contact stated that **the hood unlatched independently while driving and flew open with the hood ajar warning light illuminated.** The contact pulled over and closed the hood.

*May 27, 2020 Incident, Submitted July 28, 2020, ODI #11341915* (emphasis added).

> Hood latch broken and disengages automatically without being opened by car operator. Can open while the car is stationary or operating. The **manufacturer sent me a recall notice** to say **the remedy would not be available until mid 2021. I think this is unacceptable given the hood may fly open while driving at high speeds and the driver is unable to see out of the front window. I am writing because this situation presents a p[o]tential emergency.**

*June 1, 2020 Incident, Submitted July 24, 2020, ODI #11341397* (emphasis added).

> The contact owns a 2016 Nissan Altima. The contact stated that **while driving at 50 MPH, the hood opened independently and damaged the windshield.** The driver coasted to the side of the road. The vehicle was taken to an independent mechanic where the windshield was repaired. The **vehicle was taken to the South Shore Nissan** . . . and repaired under NHTSA campaign number: 20V315000 (latches/locks/linkages)[.] However, **the part to do the recall was not available. The contact stated that the manufacturer exceeded a reasonable amount of time for**

> **the recall repair.** The **manufacturer was made aware of the failure**. The failure mileage was 47,400. The VIN was invalid**.**

*June 6, 2020 Incident, Submitted June 17, 2020, ODI #11329383* (emphasis added).

> The contact owns a 2016 Nissan Altima. The contacted stated that **while her husband was driving 45 MPH, the hood latch unlocked causing the hood to open and smash into the windshield**. The vehicle was included in NHTSA campaign number 20V315000 (latches/locks/linkages). The vehicle was **towed to West Herr Nissan of Lockport** . . . where the **dealer confirmed that the vehicle was subject to the recall repair**. The contact was informed that **the hood and windshield needed to be replaced. The vehicle was not repaired**. The **manufacturer was informed of the failure**. The **contact was informed that notifications would be mailed out on August 1, 2020**. The failure mileage was 70,000.

*June 25, 2020 Incident, Submitted June 29, 2020, ODI #11331425* (emphasis added).

> Recall received 07/03/20 from Nissan for hood latch, R20A7. No car lift. Risk rank: collision. I **called two Nissan dealerships and they say there is no remedy**. **Car is my only source of transportation** and **Nissan corporate will not answer phone**. I am **afraid to drive my car**. . . . Pearson Nissan in Ocala, **said there is no remedy and he could care less (that was his attitude). What can I do?**

*July 8, 2020 Incident, Submitted July 8, 2020, ODI #11338216* (emphasis added).

> **Recently the hood released while in motion on a busy city street, numbered route, causing absolute obstructed vision and near collision. The damage to the hood and fenders has created very sharp jagged metal edges**. . . . Recall number 20V-315. Feeling as though this is not an insurance claim situation requiring cash deductible on my part**.**

*July 18, 2020 Incident, Submitted July 30, 2020, ODI #11342272* (emphasis added).

> **Driving on highway, absolutely no warning at all, hood flies open suddenly slamming into my windshield while driving!!!** After screaming of course, tried to keep vehicle straight, slowed, pulled over to right to safety. Unbelievably no other vehicles hit/involved, no crash—**my vehicle has damage to hood, roof, both front fenders, interior overhead controls dropped out of the ceiling. Nissan not yet committing to paying for it 100% !!!!!!** Even though a recall on this item was issued 1 month ago, and I found articles on this problem with the car going back to 2014—and **Nissan dealership just had my car 4 months ago (March) working on another different recall !!!!**

*July 25, 2020 Incident, Submitted July 28, 2020, ODI #11341785* (emphasis added).

**G. Plaintiffs purchased defective class vehicles.**

56. In May 2013, Plaintiff McCoy purchased a new 2013 Nissan Altima SV from Corona Nissan, a Nissan-authorized dealer in Riverside County.

57. Despite having extensive knowledge of the hood latch defect gained through both consumer complaints and its own internal investigations, Nissan chose not to notify Plaintiff McCoy or any other similarly situated purchasers that its Altima vehicles were defective.

///

///

///

///

///

///

///

///

///

///

///

58. As with any reasonable consumer, Plaintiff McCoy expected that she would receive a safe, reliable vehicle in exchange for the significant money she spent on her Nissan Altima. But as of February 10, 2021, Plaintiff McCoy's vehicle remains subject to Nissan's recall, with no solution in sight.

**Year:** 2013 **Make:** NISSAN **Model:** ALTIMA 2.5 SV
**Number of Open Recalls: 1**

**NHTSA Recall Number:** 20V-315 **Recall Date:** May 28, 2020
**Manufacturer Recall Number:** R20A7

**SUMMARY:**
THE SECONDARY HOOD LATCH MAY BECOME STUCK IN THE OPEN POSITION DUE TO A POTENTIAL FOR CORROSION (IN REGIONS WITH EXCESSIVE ROAD SALT USE) IN THE HOOD LATCH COMBINED WITH IMPROPER INSPECTION AND MAINTENANCE.

**SAFETY RISK:**
IF THE DRIVER INADVERTENTLY RELEASES THE PRIMARY HOOD LATCH (EX. WHILE REFUELING) OR THE HOOD IS NOT CLOSED PROPERLY, THE SECONDARY HOOD LATCH MAY NOT HOLD THE HOOD CLOSED WHILE THE VEHICLE IS IN MOTION. THE HOOD MAY OPEN WITHOUT WARNING AND OBSTRUCT THE DRIVER S FORWARD VIEW, AND MAY INCREASE THE RISK OF CRASH.

**REMEDY:**
A REMEDY PLAN IS CURRENTLY UNDER DEVELOPMENT. NISSAN WILL PROVIDE ALL AFFECTED OWNERS WITH AN INTERIM NOTIFICATION THAT REMINDS OWNERS HOW TO PROPERLY MAINTAIN THE LATCH AND ALSO REMINDS THOSE OWNERS TO FULLY CLOSE AND ENGAGE THE PRIMARY HOOD LATCH EACH TIME BEFORE DRIVING THEIR ALTIMA.

**RECALL STATUS:** **Recall INCOMPLETE. Remedy not yet available**

**MANUFACTURER NOTES:**
Please contact Nissan Consumer Affairs at (800) NISSAN-1 (or 800-647-7261) for additional questions. Monday - Friday 7:00am to 7:00pm CST

If the manufacturer has failed or is unable to remedy this safety recall for your vehicle in a timely manner, please contact the NHTSA Vehicle Safety Hotline at: 1-888-327-4236 or TTY: 1-800-424-9153 or file an online complaint with NHTSA.

*THIS RECALL DATA LAST REFRESHED: Feb 10, 2021*

59. Plaintiff Miller purchased a 2014 Nissan Altima SL from Concord Nissan, a Nissan-authorized dealer, in October 2014.

60. As it did with Plaintiff McCoy, Nissan chose not to notify Plaintiff Miller or any other similarly situated purchasers that its Altima vehicles were fundamentally defective.

61. Like Plaintiff McCoy, Plaintiff Miller expected that she would receive a safe, reliable vehicle in exchange for the significant money she spent on her Nissan Altima. But as of February 10, 2021, Plaintiff Miller's vehicle remains subject to Nissan's recall, with no solution in sight.

**Year:** 2014 **Make:** NISSAN **Model:** ALTIMA 2.5SL
**Number of Open Recalls: 1**

**NHTSA Recall Number:** 20V-315 **Recall Date:** May 28, 2020
**Manufacturer Recall Number:** R20A7

**SUMMARY:**
THE SECONDARY HOOD LATCH MAY BECOME STUCK IN THE OPEN POSITION DUE TO A POTENTIAL FOR CORROSION (IN REGIONS WITH EXCESSIVE ROAD SALT USE) IN THE HOOD LATCH COMBINED WITH IMPROPER INSPECTION AND MAINTENANCE.

**SAFETY RISK:**
IF THE DRIVER INADVERTENTLY RELEASES THE PRIMARY HOOD LATCH (EX. WHILE REFUELING) OR THE HOOD IS NOT CLOSED PROPERLY, THE SECONDARY HOOD LATCH MAY NOT HOLD THE HOOD CLOSED WHILE THE VEHICLE IS IN MOTION. THE HOOD MAY OPEN WITHOUT WARNING AND OBSTRUCT THE DRIVER S FORWARD VIEW, AND MAY INCREASE THE RISK OF CRASH.

**REMEDY:**
A REMEDY PLAN IS CURRENTLY UNDER DEVELOPMENT. NISSAN WILL PROVIDE ALL AFFECTED OWNERS WITH AN INTERIM NOTIFICATION THAT REMINDS OWNERS HOW TO PROPERLY MAINTAIN THE LATCH AND ALSO REMINDS THOSE OWNERS TO FULLY CLOSE AND ENGAGE THE PRIMARY HOOD LATCH EACH TIME BEFORE DRIVING THEIR ALTIMA.

**RECALL STATUS:** **Recall INCOMPLETE. Remedy not yet available**

**MANUFACTURER NOTES:**
Please contact Nissan Consumer Affairs at (800) NISSAN-1 (or 800-647-7261) for additional questions. Monday - Friday 7:00am to 7:00pm CST

If the manufacturer has failed or is unable to remedy this safety recall for your vehicle in a timely manner, please contact the NHTSA Vehicle Safety Hotline at: 1-888-327-4236 or TTY: 1-800-424-9153 or file an online complaint with NHTSA.

*THIS RECALL DATA LAST REFRESHED: Feb 10, 2021*

## ACCRUAL OF RIGHTS, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

62. Plaintiffs, the Class and Subclass did not discover, and could not discover through the exercise of reasonable diligence, the fact that Defendant had manufactured and/or sold Nissan Altima vehicles with a defective hood latch system dating back to the 2013 models.

63. Defendant concealed over the years the fact that the hood latch systems were defective in order to create the false impression in the minds of Plaintiffs and those similarly situated that the Altima vehicles were merchantable and safe for normal operation.

64. Plaintiffs were justified in not bringing the claims earlier based on Defendant's failure to inform Plaintiffs of the true nature, extent, and scope of the defect and the repairs and replacements needed to eliminate the hazard.

## CLASS ACTION ALLEGATIONS

65. Pursuant to Rules 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs will seek certification of a nationwide consumer class ("Class") consisting of:

> **All persons in the United States who own or owned, or lease or leased, a 2013-2018 Nissan Altima.**

66. Additionally, Pursuant to Rules 23(b)(2) and/or 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs will also seek certification of a California subclass ("Subclass") consisting of:

> **All persons who purchased or leased in California a 2013-2018 Nissan Altima.**

67. The Class and Subclass definitions specifically exclude all persons who assert personal injury claims arising from or relating to the defective hood latch systems.

68. **Numerosity.** The Class and Subclass consist of a sufficiently large group of individuals, believed to exceed 1,000 members, and is so large that it is impractical to join all members of the Class and Subclass before the Court as individual plaintiffs.

69. **Typicality.** Plaintiffs are members of the Class and Subclass, and bring claims typical of the Class and Subclass, because Plaintiffs, like all other class members, purchased or leased a class vehicle designed, manufactured, marketed, distributed, sold, and leased by Nissan. Consequently, Plaintiffs and the Class and Subclass have all been damaged by Nissan's misconduct, and have incurred or will incur the cost of repairing or replacing the defective hood latch systems or components thereof. Nissan's conduct is common to all Class and Subclass members, representing a shared factual nexus of injury to the Class and Subclass.

///

70. **Rule 23(b)(3) Commonality.** The Class and Subclass are united by a community of interest in obtaining appropriate remedies, including injunctive relief, repair or replacement of the defective vehicles, restitution, damages, and other available relief designed to redress Nissan's wrongful conduct. The questions and issues of law or fact are of a common or general interest, affecting the Class, Subclass, and public at large. Those common questions and issues include:

a. Whether the class vehicles have defective hood latch systems;

b. Whether the defects in the class vehicles' hood latch systems constitute a material fact;

c. Whether the defects in the class vehicles' hood latch systems pose an unreasonable safety risk;

d. Whether an ordinary reasonable consumer would have purchased or leased a class vehicle had they known of the hood latch system defects;

e. Whether an ordinary reasonable consumer would have paid less money to purchase or lease a class vehicle had they known of the hood latch systems—and if so, how much less an ordinary reasonable consumer would have paid;

f. Whether Nissan had actual or constructive knowledge of the hood latch defects;

g. When Nissan first gained actual or constructive knowledge of the hood latch system defects;

h. Whether Nissan had a duty to disclose the defects in the class vehicles' hood latch systems before the class and subclass members purchased or leased class vehicles;

i. Whether Nissan had an ongoing duty to disclose the defects in the hood latch systems to the class and subclass;

j. Whether Nissan breached its express and implied warranties for the class vehicles as a result of the hood latch system defects;

k. Whether Nissan has been unjustly enriched by the class and subclass members as a result of the purchase and lease of the class vehicles;

l. Whether Nissan breached its obligations to provide timely repairs for the class vehicles;

m. Whether Nissan is liable for out-of-pocket expenses incurred by class and subclass members as a result of the hood latch defects;

n. Whether Nissan should be declared legally and financially responsible for notifying the class and subclass members of the true and complete nature and extent of the hood latch system defects;

o. Whether Nissan should be declared legally and financially responsible for notifying class members of their right to reimbursement from Nissan for the costs incurred in diagnosing, repairing, and replacement defective hood latch systems;

p. Whether and to what extent Nissan is obligated to pay actual and consequential damages to the class and subclass members as a result of the hood latch system defects; and

q. Whether Nissan should be obligated to pay punitive damages as a result of the hood latch system defects, and if so, the amount of those damages.

71. **Adequacy.** Plaintiffs will fairly and adequately represent the claims of the Class and Subclass, protect the interests of the Class and Subclass without exercising personal interest or otherwise acting in a manner inconsistent with the best interests of the Class and Subclass generally. Further, Plaintiffs have retained attorneys experienced in the litigation of class and representative claims and in the area of consumer protection litigation who have agreed to and will responsibly and vigorously advocate on behalf of the Class and Subclass in their entirety.

72. **Ascertainably.** The identities of Class and Subclass members are readily ascertainable from various sources including Nissan's ownership records, government ownership records, or via simple notice by publication.

73. **Predominance.** The questions of law or fact common identified above substantially similar and predominate over those questions affecting only specific members of the Class and Subclass.

74. **Superiority.** This class action is superior to the other means available to the Class and Subclass to obtain relief because:

a. Without class certification, the prosecution of separate consumer actions by individual members of the Class and Subclass would be impracticable and financially difficult, and create a risk of repetitive, inconsistent, and varying adjudications. This would have the effect of establishing incompatible standards of conduct for Nissan, discouraging the prosecution of meritorious but small claims, and result in adjudications which would be dispositive of the interests of other class and subclass members not parties to the adjudication, or otherwise substantially impair the ability of Class and Subclass members to protect their rights and interests;

b. Because the damages suffered by each Class and Subclass member are relatively small compared to the expense and burden of prosecuting this compelling case against a well-financed, multibillion dollar corporation, this class action is the only way each Class and Subclass member can redress the harm that Nissan caused;

c. The class action procedure is superior to other methods of adjudication, and specifically designed to result in the fair, uniform and efficient adjudication of the claims presented by this complaint. This class action will facilitate judicial economy and preclude the

undue financial, administrative and procedural burdens which would necessarily result from a multiplicity of individual actions;

d. Should individual class members be required to bring separate actions, courts would face a multitude of lawsuits that would burden the court system and create a risk of inconsistent rulings and contradictory judgment; and

e. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale, and comprehensive supervision by a single court.

75. **Rule 32(b) Injunctive and Declaratory Relief.** Nissan acted or refused to act on grounds generally applicable to the class and subclass, making the award of equitable relief and/or restitution appropriate to the Class and Subclass in their entirety.

## CAUSES OF ACTION

### COUNT I

### CALIFORNIA CONSUMER LEGAL REMEDIES ACT, CAL. CIV. CODE § 1750, *ET SEQ*.

(Applicable to the Sub-Class)

76. Plaintiffs reallege all preceding paragraphs and bring this count individually and on behalf of the California Subclass.

77. Nissan is a "person" under California Civil Code § 1761(c).

78. Plaintiffs and the Subclass are "consumers" under California Civil Code § 1761(d) because they purchased class vehicles primarily for personal, family, or household use.

79. The purchase of the class vehicles by Plaintiffs and the Subclass, constitute "transactions" within the meaning of California Civil Code § 1761(e).

80. The class vehicles are "goods" within the meaning of California Civil Code § 1761(a).

81. Nissan's violations of the CLRA occurred repeatedly in Nissan's trade or practice—including the design, manufacture, distribution, marketing, sale, and lease of the class vehicles.

82. **Section 1770(a) violations.** Nissan violated California Civil Code § 1770(a) by concealing, misrepresenting, and failing to disclose the hood latch system defects, including the true nature, extent, and cause of the hood latch system defects. In particular:

a. Nissan violated California Civil Code § 1770(a)(5) by representing that the class vehicles had a characteristic that they did not actually have—i.e., that the vehicles were safe and suitable for use on the roadway, when, in fact, they were not because their hood latch systems were defectively designed such that they had an unreasonably dangerous propensity to fly open while being driven;

b. Nissan violated California Civil Code § 1770(a)(7) by representing that the class vehicles were of a particular quality, grade, or standard when, in fact, they were not of that quality, grade, or standard;

c. Nissan violated California Civil Code § 1770(a)(9) by concealing and failing to disclose that the class vehicles' hood latch systems were inherently defective, defectively designed, and not suitable for their intended use despite advertising them as safe and suitable for their intended function—maintaining the hoods closed while the vehicles are driven on the public roadways; and

d. Nissan violated California Civil Code § 1770(a)(16) by failing to market, distribute, sell, and lease the vehicles in accordance with Nissan's previous representations—i.e., that the vehicles were safe

and suitable for use on the road, when, in fact, they were not because of the hood latch system defects.

83. **Duty to disclose.** Nissan had a duty to disclose the existence, nature, and extent of the defects in the class vehicles' hood latch systems (which it breached, as alleged above), because:

a. Nissan was in a superior position to know the true facts about the hood latch system defects as the designer, manufacturer, assembler, distributor, marketer, and warrantor of the vehicles, and given its experience and knowledge as an expert and long-time veteran of the automotive industry;

b. Plaintiffs and the Subclass could not reasonably have been expected to know, learn, or discover the defects in the hood latch systems as they were not part of the process of designing, manufacturing, assembling, marketing, distributing, or warranting the vehicles;

c. Nissan knew that Plaintiffs and the Subclass could not reasonably have been expected to know, learn, or discover the existence, nature, or extent of the hood latch system defects; and

d. By virtue of having concealed the nature, extent, and scope of the hood latch system defects.

84. **Nissan's actions and/or omissions could mislead a reasonable consumer.** A reasonable consumer would expect that the hood latch system on a vehicle would not have an unreasonably dangerous propensity to fly open while the vehicle is being driven. Consequently, Nissan's unfair and deceptive trade practices could deceive a substantial portion of the purchasing public and imposed a serious safety risk on the public.

85. **Materiality.** The safe, reliable, and proper functioning of a hood latch system is a material component of an automobile transaction because it is required to ensure the vehicle can safely and properly operate on the roadways. The average

reasonable consumer would have considered the defect to constitute an important and material part of deciding whether to spend money to purchase or lease a class vehicle.

86. **Damages.** As a result of Nissan's omissions and misrepresentations, Plaintiffs and the Subclass: (1) suffered an ascertainable loss of money, property, and value of the class vehicles; and (2) were harmed and suffered actual damages because the class vehicles have a latent safety defect which has an unreasonably dangerous propensity and/or certainty to fail before the end of their expected useful life (i.e., the hood latch system should last as long as the car).

87. **Injunctive, declaratory, and other equitable relief.** Due to Nissan's original and continuing misconduct alleged above, Plaintiffs and the Subclass are entitled to injunctive, declaratory, and equitable relief, including an order, judgment, and other judicial action, decision, or proclamation:

a. Declaring that the class vehicles have material safety defects in their hood latch systems;
b. Declaring that Nissan's conduct violated the CLRA;
c. Declaring that Plaintiffs and Subclass are entitled to reimbursement or restitution for money spent on the class vehicles; and
d. Enjoining Nissan from continuing to violate the CLRA.

88. Pursuant to § 1782(a) of the CLRA, on or about February 10, 2021, Plaintiffs through counsel notified Defendant in writing via certified mail return receipt requested of the particular violations of § 1770 of the CLRA and demanded that it rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to act.

89. If Defendant fails to respond to Plaintiffs' letter, fails to agree to rectify the problems associated with the actions detailed above, or fails to give notice to all affected consumers within 30 days of the date of written notice, Plaintiffs reserve the right to amend the Complaint to pursue claims for actual, punitive, and statutory damages, as appropriate against Defendant. As to this cause of action, at this time,

Plaintiffs seek only injunctive relief.

90. Attached hereto as **Exhibit A** is a sworn declaration from Plaintiff Miller pursuant to California Civil Code § 1780(d).

91. Attached hereto as **Exhibit B** is a sworn declaration from Plaintiff McCoy pursuant to California Civil Code § 1780(d).

92. **Request for relief.** Plaintiffs, individually and on behalf of the Subclass, seek injunctive, restitution and attorneys' fees and costs, and reserve the right to amend to seek damages, including punitive damages, pursuant to Cal Civ. Code § 1780, *et seq*.

**COUNT II**

**CALIFORNIA'S UNFAIR COMPETITION LAW,**

**CALIFORNIA BUS. & PROF. CODE 17200, *ET SEQ.***

(Applicable to the Sub-Class)

93. Plaintiffs reallege all preceding paragraphs and bring this count individually and on behalf of the California Subclass.

94. The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. California Business and Professions Code § 17200.

95. The UCL imposes strict liability. Plaintiffs need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

96. **Violations of Section 17200.** Nissan violated California Business & Professions Code § 17200 (the "Unfair Competition Law" or "UCL") by engaging in "unfair competition," including through "unlawful, unfair or fraudulent business acts or practices" and "unfair, deceptive, untrue or misleading advertising." Nissan's violations include:

///

///

a. Advertising, marketing, distributing, selling, and leasing the class vehicles when Nissan knew those vehicles were defective and unable to reliably and safely perform their intended use;

b. Failing to disclose the true nature, scope, and extent of the hood latch system defects; and

c. Concealing material facts regarding the class vehicles—i.e., that those vehicles had dangerously defective hood latch systems.

97. **Duty to disclose.** Nissan had a duty to disclose the existence, nature, and extent of the defects in the class vehicles' hood latch systems (which it breached, as alleged above), because:

a. Nissan was in a superior position to know the true facts about the hood latch system defects as the designer, manufacturer, assembler, distributor, marketer, and warrantor of the vehicles, and given its experience and knowledge as an expert and long-time veteran of the automotive industry;

b. Plaintiffs and the Subclass could not reasonably have been expected to know, learn, or discover the defects in the hood latch systems as they were not part of the process of designing, manufacturing, assembling, marketing, distributing, or warranting the vehicles;

c. Nissan knew that Plaintiffs and the Subclass could not reasonably have been expected to know, learn, or discover the existence, nature, or extent of the hood latch system defects; and

d. By virtue of having concealed the nature, extent, and scope of the hood latch system defects.

***"Unlawful" Prong***

98. A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

99. **Unlawful conduct.** Nissan's conduct is unlawful in that it violates:

a. The CLRA, as alleged in Count I;

b. The Song-Beverly Act, as alleged in Count III, below;

c. The Transportation Recall Enhancement, Accountability and Documentation Act (the "TREAD Act"), 49 USC § 30101, *et seq*. (by failing to timely inform NHTSA of the nature, extent, and scope of the hood latch system defects and allowing vehicles to continue to be sold, leased, and used in a dangerous defective condition);

d. The express warranty provisions of California Commerce Code § 2313, as alleged in Count IV below; and

e. The Magnusson-Moss Warranty Act, as alleged in Count V below.

***"Unfair" Prong***

100. A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

101. Defendant's actions constitute "unfair" business practices because, as alleged above, Defendant engaged in a misleading and deceptive practice of knowingly or intentionally selling defect class vehicles.

102. Defendant's acts and practices offend an established public policy of transparency in the sale or lease of consumer vehicles, and engage in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

103. The harm to Plaintiffs and the members of the Subclass grossly outweighs the utility of Defendant's practices.

*"Fraudulent" Prong*

104. A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

105. Defendant's practices and omissions alleged above constitute fraudulent business acts or practices as they deceived Plaintiffs and the Subclass members and are highly likely to deceive members of the consuming public into purchasing a class vehicle that unbeknownst to Plaintiffs and the Subclass were dangerously defective.

106. **Damages.** As a result of Nissan's actions, omissions, and misrepresentations, Plaintiffs and the Subclass members: (1) suffered an ascertainable loss of money, property, and value of the class vehicles; and (2) were harmed and suffered actual damages because the class vehicles have a latent safety defect which has an unreasonably dangerous propensity and/or certainty to fail before the end of their expected useful life (i.e., a hood latch system should last as long as the car).

107. **Injunctive, declaratory, and other equitable relief.** In light of Nissan's original and continuing misconduct alleged above, Plaintiffs and the Subclass members are entitled to injunctive, declaratory, and equitable relief, including an order, judgment, and other judicial action, decision, or proclamation:

a. Declaring that the class vehicles have material safety defects in their hood latch systems;

b. Declaring that Nissan's conduct violated the UCL;

c. Declaring that Plaintiffs and the Subclass are entitled to reimbursement or restitution for money spent on the class vehicles; and

d. Enjoining Nissan from continuing to violate the UCL.

108. **Request for relief.** Plaintiffs, individually and on behalf of the Subclass, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

///

**COUNT III**

**SONG-BEVERLY ACT,**

**CAL. CIV. CODE §§ 1790, *ET SEQ*.**

(Applicable to the Sub-Class)

109. Plaintiffs reallege all preceding paragraphs and bring this count individually and on behalf of the California Subclass.

110. The class vehicles are "consumer goods" under California Civil Code § 1791(a).

111. Plaintiffs and the Subclass members are "buyers" under California Civil Code § 1791(b). Nissan is the "manufacturer" of the class vehicles under California Civil Code § 1791(j).

112. **The implied warranty.** Nissan impliedly warrantied to Plaintiffs and the Subclass members that the class vehicles were "merchantable" under California Civil Code §§ 1791.1(a) & 1792.

113. **Breach of the warranty.** The class vehicles are not merchantable, and as such Nissan breached its implied warranty, because:

a. The class vehicles do not have the quality that a buyer would reasonably expect due to the hood latch defects;

b. The class vehicles would not pass without objection in the automotive trade given that their hoods have an unreasonable propensity to fly open while the vehicles are being driven;

c. The hood latch defects render the vehicles unsafe to drive and unfit for ordinary purposes;

d. The labeling for the class vehicles failed to disclose the hood latch defects; and

e. The vehicles do not conform to their labeling, which represents that the vehicles are safe and suitable for their intended use.

114. **Damages.** Plaintiffs and the Subclass received the vehicles in a condition which substantially diminishes their value, and which prevents the vehicles from safely and properly functioning. As a result, Plaintiffs are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their vehicles, or the overpayment or diminution in value of their vehicles.

115. **Relief.** Plaintiffs, individually and on behalf of the Subclass, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

**COUNT IV**

**EXPRESS WARRANTY**

(Applicable to the Sub-Class)

116. Plaintiffs reallege all preceding paragraphs and bring this count individually and on behalf of the Subclass.

117. **The Warranties.** Nissan issued an express written warranty for each defective vehicle it sold, including that:

a. The hood latch systems would be free of defects in materials and workmanship at the time of sale; and

b. The class vehicles would be free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized service facilities, without charge, to fully correct defects in materials or workmanship.

118. **Breach.** Nissan breached its warranty for the class vehicles because:

a. The hood latch systems have latent defects which have a dangerous propensity to cause the hoods to unlatch while the vehicles are in motion, subjecting Plaintiffs and the Class and Subclass to the risk of loss and injury; and

b. Nissan denied, concealed, and misrepresented the defect, in the process refusing to pay for or provide in a reasonably timely fashion

the needed repairs and replacements for Plaintiffs and the Class and Subclass.

119. **Damages.** Nissan's breach of its express warranties proximately caused the Subclass to suffer damages in excess of $5,000,000.00.

120. **Request for relief.** Plaintiffs, individually and on behalf of the Subclass, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

**COUNT V**

**MAGNUSSON-MOSS WARRANTY ACT**

(Applicable to the Class and Sub-Class)

121. Plaintiffs reallege all preceding paragraphs and bring this count individually and on behalf of the Class and Subclass.

122. Plaintiffs and members of the Class and Subclass are "consumers" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(3).

123. Nissan is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(4) and (5).

124. The defective class vehicles at issue are "consumer products" within the meaning of the Magnuson-Moss Act, 15 U.S.C. § 2301(6).

125. **The warranties.** Nissan warrantied that:

a. The class vehicles would be free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized service facilities, without charge, to correct defects in materials or workmanship; and

b. The class vehicles' hood latch systems would be free of defects in materials and workmanship at the time of sale.

126. **Breach.** Nissan breached its warranties for the class vehicles because:

a. The hood latch systems have latent defects which cause them to have a dangerous propensity to suddenly fly open while the cars are driven, thereby subjecting Plaintiffs and the Class and Subclass to the risk of loss and injury;

b. Nissan denied and concealed the existence of said defects, in the process refusing to pay for needed repairs and replacements for Plaintiffs and the Class and Subclass; and

c. Nissan failed to provide the needed repair or replacement for the fundamental design defect impacting the class vehicles.

127. **Damages.** Plaintiffs, the Class, and the Subclass sustained damages and other losses due to Nissan's breach of its warranties. Plaintiffs, the Class, and the Subclass will suffer irreparable harm if Nissan is not ordered to properly repair all of the defective class vehicles immediately, offer rescission to the Class and Subclass by repurchasing their defective class vehicles for their full cost, and reimburse the owners and lessees of the defective class vehicles for the monies they have paid to own and lease the vehicles.

128. **Informal dispute resolution is futile.** Resorting to any informal dispute resolution procedure or affording Nissan a reasonable opportunity to cure its breach of written warranties to Plaintiffs, the Class, and Subclass is unnecessary and futile. At the time it sold and leased the class vehicles, Nissan knew, should have known, or was reckless in not knowing of its misrepresentations or omissions concerning the hood latch system defects, but nevertheless failed to rectify the situation or disclose it to Plaintiffs, the Class, and Subclass.

129. Moreover, the remedies available through any informal dispute resolution procedure would be wholly inadequate under the circumstances. Accordingly, any statutory requirement that Plaintiffs resort to an informal dispute resolution procedure or afford Nissan a reasonable opportunity to cure its breach of written warranties is excused and, thereby, deemed satisfied.

130. **Request for relief.** Plaintiffs, individually and on behalf of the Class and Subclass, seek all available monetary damages (including actual, compensatory, and punitive damages), injunctive and equitable relief, and attorneys' fees and costs.

## PRAYER FOR RELIEF

Plaintiffs pray that judgment be entered against Defendant as follows:

1. That this action be certified as a class action;
2. That Plaintiffs be appointed as the representatives of the Class and Subclass;
3. That Plaintiffs' attorneys be appointed Class Counsel;
4. For an order declaring Defendant's conduct to be unlawful;
5. For an order compelling Defendant to make restitution to Plaintiffs, the Class and Subclass members in an amount to be proven at trial;
6. For actual damages;
7. For punitive damages;
8. For pre and post -judgment interest at the legal rate;
9. For injunctive and other equitable relief as necessary to protect the interests of Plaintiffs, and members of the Class and Subclass, and an order prohibiting Defendant from engaging in the unlawful, unfair, deceptive and fraudulent acts described above;
10. For an order that Defendant engage in a corrective advertising campaign;
11. For an order of restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiffs and the members of the Class and Subclass as a result of its unlawful, unfair, and fraudulent business practices;
12. For attorneys' fees, costs of suit, and out of pocket expenses; and
13. For such other and further relief that the Court deems proper.

///

///

**DEMAND FOR JURY TRIAL**

131. Plaintiffs, on behalf of themselves, the Class, and the Subclass, hereby demand a trial jury of all issues triable by right.

Dated: February 10, 2021

**KAZEROUNI LAW GROUP, APC**

By /s/ Abbas Kazerounian

Abbas Kazerounian
ak@kazlg.com

**Additional Counsel for Plaintiffs**
**KAZEROUNI LAW GROUP, APC**
Jason A. Ibey (SBN: 284607)
jason@kazlg.com
321 N. Mall Drive, Suite R108
St. George, Utah 84790
Telephone: (800) 400-6808
Facsimile: (800) 520-5523

**LEVIN PAPANTONIO RAFFERTY**
William F. Cash, III (*Pro Hac Vice Forthcoming*)
bcash@levin.com
316 S. Baylen Street
Pensacola, Florida 32502
Telephone: (850) 435-7059

**NEWSOME MELTON, PA**
C. Richard Newsome (*Pro Hac Vice Forthcoming*)
newsome@newsomelaw.com
William C. Ourand, Jr. (*Pro Hac Vice Forthcoming*)
ourand@newsomelaw.com
201 S. Orange Ave., Suite 1500
Orlando, Florida 32801
Telephone: (407) 648-5977

*Attorneys for Plaintiffs, Tinisha Miller and Robin McCoy*